**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No.: 24-cr-421 (LLA)** |
| | : | |
| **YANA LEONOVA** | : | |
| **(a/k/a YANA LIAVONAVA)** | : | |
| | : | |
| **Defendant.** | : | |

**STATEMENT OF OFFENSE**

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, **YANA LEONOVA** ("LEONOVA"), with the concurrence of her attorney, agree and stipulate to the below factual basis for the defendant's guilty plea – that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

**The Export Control Reform Act and**
**Export Administration Regulations**

1. The Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Sections 730-774, were promulgated by the United States Department of Commerce, Bureau of Industry and Security ("BIS") to regulate the export of goods, technology, and software from the United States. Under the Export Control Reform Act ("ECRA"), it is a crime to violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR, according to Title 50, United States Code, Section 4819(b). Willful violations of the EAR constitute criminal offenses under the ECRA, as provided in Title 50, United States Code, Section 4819(b).

2. Through the EAR, BIS reviews and controls the export of certain items from the

United States to foreign countries in accordance with Title 15, Code of Federal Regulations, Sections 734.2-3. Among other scenarios, BIS places restrictions on the export and reexport of items to certain countries that it determines could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

3. The most sensitive items subject to the EAR controls are identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1. Items listed on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which is subject to export control requirements depending on destination, end use, and end user of the item.

4. On February 24, 2022, in response to Russia's unprovoked invasion of Ukraine, the U.S. Department of Commerce imposed new license requirements on exports and reexports to Russia. As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL requires a license to be exported or reexported to Russia. *See* Volume 87, Federal Register, Page 12226 (published Mar. 3, 2022).

**The Commerce Control List Items**

5. During the relevant time period, the items below were identified on the CCL and classified by BIS under the corresponding ECCNs. As of February 24, 2022, an export license was required from the Department of Commerce to export or reexport each of these items to Russia.

| Exported Item | ECCN |
| --- | --- |
| 2 "Window LH" (P/N STA320-1-9-3)<br>2 "Window RH" (P/N STA320-2-9-3) | LH Windshield: 9A991.d<br>RH Windshield: 9A991.d |

| Exported Item | ECCN |
| --- | --- |
| 1 multiscan weather device (P/N 822-2256-001) | 6A998.a |
| 1 fan blade pair (P/N 363-906-002-0) | 9A991.d |
| 1 fan blade pair (P/N 363-906-002-0) | 9A991.d |

**The Conspiracy to Violate Export Controls Targeting Russia**

6. LEONOVA was a Belarussian citizen residing in Russia.

7. Between at least in or around December 2021 and in or around May 2023, LEONOVA was employed at Russian Company-1 as a Logistics Manager and in that role was engaged in the procurement of civil aviation components, many of which are subject to the EAR, and the illegal export of those items from the United States to Russia, via Armenia.

8. Russian Company-1 was located in Moscow, Russia, with a branch office in St. Petersburg, Russia, and was an operator of civil private chartered aircraft, including planes and helicopters. According to the English version of Russian Company-1's website, Russian Company-1's fleet included aircraft manufactured by Airbus, Bombardier, Dassault, Gulfstream, and others.

9. At all relevant times, Co-Conspirator A was a naturalized U.S. citizen who resided in New Jersey. Co-Conspirator A was the founder, owner, and manager of U.S. Company-1 in the United States, which he incorporated in or around September 2020.

10. At all relevant times, U.S. Company-1 supplied aircraft components, such as rotables, expendables, hardware, spares, and electronic components for commercial and private aircrafts manufactured by Airbus, Boeing, Bombardier, Dassault, Gulfstream, and others.

11. At all relevant times, Armenian Company-1, a company registered and operating in Armenia, was a company that Russian Company-1 and U.S. Company-1 used to transship

aircraft components to Russia. Armenian Company-1 was incorporated in Armenia on or about April 15, 2022.

12. At all relevant times, Co-Conspirator B was a citizen of Armenia and the apparent operator of Armenian Company-1.

13. At all relevant times, Co-Conspirator C was a citizen of Armenia and a founder and director of record of Armenian Company-1.

14. Prior to in or around February 2022, LEONOVA, in her employee role at Russian Company-1, made purchases of aviation equipment directly from suppliers in the United States, with such components shipped directly to Russian Company-1 in Russia. The last of these purchases for export directly to Russia occurred 10 days before Russia's invasion of Ukraine and the imposition of increased restrictions on trade with Russia.

15. Following in or around February 2022, LEONOVA's procurement practices changed. Instead of purchasing directly from U.S. suppliers, Russian Company-1 and U.S. Company-1 began using transshipment companies in third countries, including Armenian Company-1. Between in or around May and in or around October 2022, U.S. Company-1 exported aircraft components almost exclusively to Armenian Company-1. As of on or about December 31, 2022, U.S. Company-1 exported at least 26 shipments to Armenian Company-1.

16. Co-Conspirator A made the initial introduction between Armenian Company-1 and Russian Company-1. On or about May 18, 2022, Co-Conspirator A sent an email with the subject line "Introduction" to Co-Conspirator B and LEONOVA. In the email, Co-Conspirator A wrote, "Dear Yana [LEONOVA] and [Co-Conspirator B], I would like to make the initial introduction. Please connect over the phone and discuss the details. Please let me know if you need any additional information from me." After this introduction, there were multiple shipments from U.S.

Company-1 to Armenian Company-1 and ultimately to LEONOVA's Russian Company-1. Neither U.S. Company-1, Armenian Company-1, Russian Company-1, nor any of their representatives obtained the necessary export licenses from BIS for these shipments, and no license exception was otherwise available for the shipments.

17. Between at least in or around May 2022 and continuing to in or around May 2023, in the District of Columbia and elsewhere, the defendant, YANA LEONOVA, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown, including individuals associated with Russian Company-1 and Armenian Company-1, to commit offenses against the United States and to willfully export and cause the exportation of goods from the United States to Russia without first having obtained the required licenses from the Department of Commerce in violation of Title 50, United States Code, Section 4819(a), and Title 15, Code of Federal Regulations, Sections 736.2, 746.8, and 764.2.

**The Exports to Russia**

18. Each of the exports described below – which were subject to a fulfilment order sent by LEONOVA on behalf of Russian Company-1 after February 24, 2022 – was intended for transshipment to Russia in violation of U.S. export controls. LEONOVA had direct knowledge of the intended destination and actively participated in accomplishing the successful transshipment. Further, LEONOVA was aware of the Department of Commerce restrictions on shipment of these parts to Russia without a license, as demonstrated by her role as a Logistics Manager for Russian Company-1 and her correspondence with Co-Conspirator A and other U.S.-based aircraft component supplier about these restrictions. The relevant exports are discussed below.

***Order 50 (May – July 2022)***

19. On or about May 31, 2022, LEONOVA, in her employee role at Russian Company-

1, sent an order for fulfilment to Co-Conspirator A for two "Window LH" (P/N STA320-1-9-3) and two "Window RH" (P/N STA320-2-9-3).

20. On or about June 2, 2022, Russian Company-1 caused payment for this order to be made via a wire transfer from Russian Company-1's bank account in Russia to Armenian Company-1's bank account in Armenia.

21. On or about June 8, 2022, U.S. Financial Institution-1 received $82,655 from Armenian Financial Institution-1 in Armenia for payment of Order 50. The ultimate source of the funds for Order 50 was Russian Company-1.

22. On or about June 24, 2022, Co-Conspirator A exported four Airbus windows, with part numbers STA320-1-9-3 and STA320-2-9-3, to Armenian Company-1 in fulfilment of the order.

23. On or about July 7, 2022, this order was subsequently reexported by Armenian Company-1 in Armenia to Russian Company-1 in Russia.

24. A license determination by BIS showed that the items were classified as ECCN 9A991.d, and that, during the relevant timeframe, such items required an export license to be shipped to Russia, which none of the involved parties applied for or obtained.

25. Co-Conspirator A caused an Electronic Export Information ("EEI") filing not to be made with respect to this shipment, despite knowing that one was required because of the export's value and end destination.

***Order 59 (June – June 2022)***

26. On or about June 15, 2022, LEONOVA, in her employee role at Russian Company-1, sent an order for fulfilment to Co-Conspirator A for a multiscan weather radar device, part number 822-2256-001.

27. On or about July 1, 2022, Russian Company-1 caused payment for this order to be made via a wire transfer from Russian Company-1's bank account in Russia to Armenian Company-1's bank account in Armenia. On or about July 4, 2022, U.S. Financial Institution-1 received $297,000 from Armenian Financial Institution-1 in Armenia for payment of Order 59. The ultimate source of the funds for Order 59 was Russian Company-1.

28. On or about July 14, 2022, Co-Conspirator A exported a multiscan weather device, with part number 822-2256-001, to Armenian Company-1 in fulfilment of the order. On or about July 21, 2022, the weather device was reexported by Armenian Company-1 in Armenia to Russian Company-1 in Russia.

29. A license determination by BIS showed that the item was classified as ECCN 6A998.a, and that, during the relevant timeframe, required an export license to be shipped to Russia, which none of the involved parties applied for or obtained.

30. Co-Conspirator A caused an EEI filing not to be made with respect to this shipment, despite knowing that one was required because of the export's value and end destination.

***Order 62 (July – August 2022)***

31. On or about July 6, 2022, LEONOVA, in her employee role at Russian Company-1, sent an order for fulfilment to Co-Conspirator A for a pair of Airbus fan blades with part number 363-906-002-0.

32. On or about July 11, 2022, and on or about July 12, 2022, Russian Company-1 caused payment for this order to be made via wire transfers from Russian Company-1's bank account in Russia to Armenian Company-1's bank account in Armenia.

33. On or about July 12, 2022, U.S. Financial Institution-1 received $100,000 from Armenian Financial Institution-1 in Armenia for payment of Order 62.

34. On or about July 13, 2022, U.S. Financial Institution-1 received $97,500 from Armenian Financial Institution-1 in Armenia for payment of Order 62. The ultimate source of all funds for Order 62 was Russian Company-1.

35. On or about August 2, 2022, Co-Conspirator A exported a set of Airbus fans blades, with part number 363-906-002-0, to Armenian Company-1 in fulfilment of the order.

36. On or about August 31, 2022, the fan blades were reexported by Armenian Company-1 in Armenia to Russian Company-1 in Russia.

37. A license determination by BIS showed that the items shipped in this order were classified as ECCN 9A991.d, and that, during the relevant timeframe, required an export license to be shipped to Russia, which none of the involved parties applied for or obtained.

38. Co-Conspirator A caused a false EEI filing for this shipment to be submitted to the U.S. government that inaccurately listed Armenian Company-1 as the ultimate consignee (*i.e.*, end user) and Armenia as the ultimate destination for this shipment.

***Order 64 (July – August 2022)***

39. On or about July 7, 2022, LEONOVA, in her employee role at Russian Company-1, sent an order for fulfilment to Co-Conspirator A for a second set of Airbus fan blades, with part number 363-906-002-0.

40. On or about July 13, 2022, and on or about July 18, 2022, Russian Company-1 caused payment for this order to be made via wire transfers from Russian Company-1's bank account in Russia to Armenian Company-1's bank account in Armenia.

41. On or about July 14, 2022, U.S. Financial Institution-1 received $100,500 from Armenian Financial Institution-1 in Armenia for payment of Order 64.

42. On or about July 19, 2022, U.S. Financial Institution-1 received $100,000 from Armenian Financial Institution-1 in Armenia for payment of Order 64. The ultimate source of all

funds for Order 64 was Russian Company-1.

43. On or about August 19, 2022, Co-Conspirator A exported a second set of Airbus fan blades, with part number 363-906-002-0, to Armenian Company-1 in fulfilment of the order.

44. On or about August 31, 2022, this item was reexported from Armenian Company-1 in Armenia to Russian Company-1 in Russia.

45. A license determination by BIS showed that the items shipped in this order were classified as ECCN 9A991.d, and that, during the relevant timeframe, required an export license to be shipped to Russia, which none of the involved parties applied for or obtained.

46. Co-Conspirator A caused a false EEI filing for this shipment to be submitted to the U.S. government that inaccurately listed Armenian Company-1 as the ultimate consignee (*i.e.*, end user) and Armenia as the ultimate destination for this shipment.

47. LEONOVA's illegal export activities encompassed more shipments than the four exports detailed above.

**Knowledge and Willful Disregard of Export Controls**

48. LEONOVA has been involved in the procurement of aviation components for several years, as she worked for Russian Company-1 since at least in or around December 2021 through in or around May 2023. As part of this role, LEONOVA served as the Logistics Manager of Russian Company-1 where she was the point of contact for her employer for shipments directed to Russia.

49. From at least in or around February 2022 until the present, LEONOVA was familiar with U.S. export control laws and knew that U.S. export controls, including licensing requirements, applied to aviation components. LEONOVA knew that the items she caused to be purchased by Russian Company-1 from U.S. companies and exported to Armenia and elsewhere, including

aviation components, would be transshipped to Russia in violation of U.S. export controls. Despite this knowledge and her knowledge of U.S. export controls, LEONOVA willfully conducted the transactions involving aviation components described above with the intent of providing export-controlled items to Russian Company-1, in violation of U.S. laws.

**Limited Nature of Statement of Offense**

50. The information contained in this Statement of Offense is not a complete recitation of all the facts and circumstances known by the parties. Nonetheless, the facts in this Statement of Offense are sufficient to prove beyond a reasonable that the defendant committed the offense to which she is pleading guilty.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: [signature]

EMMA ELLENRIEDER (D.C. Bar No. 1015108)
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20579
Office: (202) 252-2656
Emma.Ellenrieder2@usdoj.gov

~~March~~ May 20, 2026

DEFENDANT'S ACCEPTANCE

I, Yana Leonova, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 5/20/2026

Yana Leonova
Defendant

ATTORNEY'S ACKNOWLEDGEMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 5/20/26

Anna V. Brown
Attorney for Defendant